Good morning, Your Honors. Jonathan Kline, Deputy Attorney General for Respondent Charles Harrison. If I may, I'd like to reserve two minutes of my argument time for rebuttal. Your Honors, this is a case where the district court found that the trial prosecutor purposefully discriminated in his use of peremptory challenges against African Americans, even though he panel that included seven jurors or alternates of African descent. And at the time the prosecutor accepted this heavily black panel, he still had 11 peremptory challenges, which he could have used to dismiss one or more of the remaining black jurors. And the statistics in this case, upon which the district court heavily relied, more than but in fact that he was discriminating against non-blacks. And if I may, I'd like to briefly highlight three of these statistics. One of which is the racial composition of the final jury as composed to the racial composition of the veneer as a whole. Obviously, if the racial composition of the final jury is higher than the racial than the, for example, the veneer, then that would be strong evidence tending to refute any inference of discrimination on the prosecutor's part. And to break this down, here the jury was 33% black and there was another juror who was part black, meaning that 42% of the jury was of African descent. And when the alternate jurors are taken into account as they have been in many cases, then that number swells to 47%. The jury was 47% black, but the veneer in this case was only 25% black. And that statistic in itself is strong evidence that the prosecutor was not discriminating against blacks. Another comparison that courts have made is the percentage of available blacks who served on the jury as compared with the percentage of available non-blacks who served on the jury after the trial courts caused removals. In this case, 50% of all available blacks served on the jury, but only 33% of all available non-blacks served on the jury after the trial courts caused removals. How do you define available? How are you using the word available? In this case, I believe there were six jurors who were dismissed for cause, for hardship and or, excuse me, I think it was seven, for other, for those reasons. So of the remaining jurors, the statistics are, I believe, six, there were 12 available black jurors who had not been dismissed for cause. Six of them served as either jurors or alternates. But as to the jurors who were not black, there were 27 that were available, and only nine of them served for a percentage of 33%. So there's a 17% differential cutting in favor of the prosecutor discriminating against non-blacks in this case. And then I'd also like to point out that of the 15 jurors who were originally slotted to fill the 12 juror spots and three alternate spots, five of those jurors were black. So 33% of them were black. But as I said, of the ultimate jury, 47% of the 15 jurors were either black or part black. You're reaching the third prong, right? Well, this, these analyses would go both to prong one and prong three. Well, go ahead. Well, it seems like in prong one, the burden of proof and so forth, that there was a question that the prima facie case had been met. Then the prosecutor gave no explanation for why. And so now it seems like we're down to prong three, unless, unless you're basing it entirely on prong one, that the burden of proof on the part of the defendant was not met. I'm asserting that there has not been an inference of discrimination shown on the part of the prosecutor. No prima facie case. And I'm also asserting that the Answer that question. No prima facie case? Is that your That, that is my position, Your Honor. How can you say that when the prosecutor exercised nine of his 20 peremptories and then the defense counsel got up and made a Batson-Wheeler objection and the prosecutor stated nothing on the record as to why, why he, he challenged four African-Americans, three Latinos, one person of mixed race, and one white person. There's nothing, there's nothing on the record. So there's certainly a prima facie case right there. You just look at the record. Then the, then the, then the, then the prosecutor's got to come in and, and, and give a non-discriminatory reason as to why these people were excused. He didn't do that. So you got a prima facie case, you got no reason on the record. Then when they came to the, to the hearing, he had, the, the prosecutor admitted to the, to the magistrate judge at a hearing, we had a big hearing on this. That, that, that he really couldn't remember what his reasons were. He tried to reconstruct them, but he, he really didn't know. So he didn't put on any, any contrary evidence. So all we got now is the prima facie case. That's all you got. You, your Honor's synopsis of the proceedings is largely correct. With respect to. Where, where is it incorrect? Well, with respect to, to what he said at trial, when defense counsel made his Batson motion, he asserted that the petitioner defendant had not made a prima facie case and the judge did not order him to give his reasons. So there, there could be many reasons as to why he would not want to. He offered, though, the judge offered an opportunity for him to do it and he declined, is the way I read it. That, that is true. And there are many reasons as to my, as to why he may have wanted to decline. Aside from the fact that he was trying to hide something. For example, I, I know I've heard in other cases that certain DA's offices have policies of not disclosing records until they're ordered to by the trial judge. Well, you're going outside the record here. Yeah, in other words, he had an opportunity to state his reasons and he declined. So all we got is the prima facie case. And, and, and even if a prima facie case is shown in this case. It is shown. Okay. If we move on to step three of the Batson test, all, all of these statistics that I was talking about. How do you get the three? If you got, you got one, right? There's a prima facie case. Then you come to, you come to two, there's nothing there. Well, the prosecutor, the prosecutor did offer reconstructed reasons at prong two. But then he did offer reconstruct reasons, but then he told the magistrate judge, you know, the truth is I really don't remember. Well, I believe that question is answered by this court's recent decision in Yvie Dunn. Isn't that what he said? He said that he could not individually recall the jurors. And what he did was review the voir dire transcript. And he saw certain answers that would have caused him concern. Yeah, but then when the chips were down, he said to the magistrate judge, I really don't remember. But with respect to. Isn't that what he said? I'm sorry, could you want to repeat the question? When the chips were down and the magistrate judge got on him on this, didn't he say that he really didn't remember? He had no memory of it. He, he had no actual recollection of the voir dire process. That, that is correct. We got a blank on that. And with respect to whether this moves to prong three, the matter does not necessarily end at prong two. In Yvie Duncan, this Court recently decided just last month that even if a prosecutor does not come forward with any reasons whatsoever at prong two, the matter cannot be decided at step two, but it has to go to step three where the Court makes the determination of whether there is a purposeful discrimination on the part of the prosecutor. And that is consistent with. But if that's all a court's got is the evidence on the prima facie case, what other conclusion can be drawn? Well, again, there are all these statistics in this case, which I believe is what this Court based the prima facie finding on. The statistics in this case really cut both ways. And so there's really no, there's really not any evidence where that demonstrates purposeful discrimination on the part of the prosecutor in this case, especially when considered with all the other evidence, especially the fact that he allowed so many black prospective jurors or black jurors to remain on the jury. That is strong evidence that he was not discriminating against blacks. And unless the Court has any questions, I will save my remaining time for rebuttal. May it please the Court. Thank you, Your Honor. Tarik Adlai for Parish Calhoun, Appellee. After a full evidentiary hearing, the district court found that the prosecutor's submission of a sworn declaration that he quickly disavowed is both false and misleading, combined with the abject implausibility of the prosecutor's proposed reasons for striking the black jurors, quote, forces a conclusion that the prosecutor engaged in racial discrimination during jury selection. We heard a lot about statistics. Caltech is right down the street, Your Honor. This case is not about statistics. Those two principles. Oh, yeah, it is, really. I mean, you get down to it that you can talk all you want about the prosecutor's reasons, but they don't demonstrate purposeful discrimination. They may offer an unsuccessful explanation for what he did, but it seems to me the only affirmative demonstration comes from the statistics. Actually, Your Honor, the Supreme Court in Johnson emphasized that a highly relevant factor is that can be the cross-racial nature of an accusation. And there's no question that in this case, Mr. Calhoun was an African-American, and the victim in this case was of another race. Let me ask, who did Mr. Calhoun's counsel exercise his challenges against? Your Honor, I don't quite recall specifically. I'll be honest. My file in this case is still sitting in Honolulu with a law clerk that didn't fly here, so I'm trying to remember. I struggled hard to try to figure this out, and I wasn't entirely successful. But it seemed to me that the real key – everybody can come up with statistics. I mean, I had – I wrote papers in college about how you can prove almost anything with statistics. What I wanted to try to figure out is, what was the prosecutor's behavior with regards to the pool that he had to choose from? Because it's plain he did not have the 48-member veneer panel to choose from, because they weren't all in the box, and some of them were excused for cause, and some of them presumably were challenged by the defendant. And that I found very difficult to figure out, because looking at the comparison, the before and after, which the State wants to talk about, really suggests to me that a disproportionate number of black jurors were eliminated by the cause process, that they asked to get out for whatever reason. And also that your client's challenges were exercised in favor of excusing white jurors, which, of course, Batson doesn't apply to the defendant. But I was trying to figure out the numbers at a very difficult time. So with that background, what was the pool the prosecutor faced? Your Honor, I would like to correct something, in that there was only one – my recollection of the record is there was only one African-American juror who was struck by the defense. I think there were only two or three white jurors who were struck by the defense, and I think there were one or two Latinos. And it might – and the – my recollection of the record is actually that they were widely dispersed. They were not targeted against whites. This was not a case where the prosecutor had any justification trying to counterbalance. I think the – Well, if we just assume the numbers you offered up were correct, that would mean if your – if your client excused four, one was black, so the argument could be built, well, 75 percent of your peremptory challenges were used against non-blacks, in the same way that it's being said that 80-some percent of the peremptory challenges by the State were used against non-whites. When you're dealing with small pools, the numbers kind of fly pretty far to the side. Well, Your Honor, as I said, I don't view this case purely about statistics. There are some relevant statistics in Step 1. This Court in Stubbs v. Gomez held that the Step 1 inquiry – once the Court has held an evidentiary hearing, the Step 1 inquiry is now moot. And I think there are very good reasons for that, especially once the Court, once the district court, has made a finding of purposeful discrimination. Courts have an affirmative duty. But as I recall, and again, it's purely by memory, that – that finding was built on the statistics. And it was the straight-line statistics that – that you offered up with regard to 8 out of 9 of the prosecutor's challenges being used against non-whites and the 44 percent versus – I've forgotten what the other number was – comparison between using them against blacks as against the – 25 percent, I think it was, the black composition of the original 48-member panel. That seemed to me to be the foundation of the district court's conclusion. Well, Your Honor, those are the facts that the district court highlighted in support of the prima facie court case. Of course, what this Court has before it is the record, and the entire record. And additional facts that are in the record that support the district court's conclusion can be relied upon and considered. And those were before the district court. The district court didn't necessarily have to – didn't have an obligation to cite every one of those. And one of the facts that was before the district court is that the pool of African-American jurors who were struck by the prosecutor were widely dispersed in age, in occupation, in residential area. They were a mixed bag of married and single people as well, people who had been victimized by crime, people who hadn't. So a wide variety of African-Americans were struck by this – by this prosecutor. In addition, the district court also had before it the fact that the African-Americans shared many common similarities with the white jurors who were allowed to remain by the prosecutor and who actually were seated on the jury. There were several people who were in media. There were several people who were involved in broadcast production. There were people who were single. So there was – there were bridges between the African-Americans and – and the white people who were allowed to sit on this jury. It's also very important. The prosecutor knew that this was going to turn out to be an interracial credibility contest. Was that Mr. Calhoun in the car? That was the nature of the – Robertson, maybe, although the thing – one of the things that strikes me about this case is, as I think you pointed out in one of your briefs, look at where you are. You're downtown L.A. Yes. And – and what it says to me is it's true, and you can expect a panel that would be heavily composed of, I'll just say, minority members, but it's not like the prosecutor ever has hope of selling a bill of goods. No matter what he does, the jury's – the jury's going to be composed of a substantial number, indeed, probably a majority, as turned out to be the case, of non-whites. So you don't have somebody here that's trying to strike the odd minority member in Texas, making sure he gets an all-white jury because they won't believe anything a plaque says. You've got to get a unanimous vote for a conviction, which means he's got to get a vote of mostly non-white jurors. It does not affect the context somehow. It seems to me that the prosecutor has a hopeless task. If it's an all-white jury, he can never get it. Well, Your Honor, the Constitution prohibits the striking of even one black juror. And it's our contention – No, no, no. Say that again. I'm sorry. There's a missing word, but we understand that. The Constitution prohibits racial discrimination, the racially biased striking of even a single black juror. And it's our contention, and the district court found, that this prosecutor struck more than one juror for racially biased reasons. And even if the ultimate panel would consist of and contain persons of color, that doesn't mean that the prosecutor – Isn't your answer that we've got this three-pronged test, and it's set up to help us make that determination? And the defense counsel got up after the ninth peremptory and made his challenge. The prosecutor had an opportunity, the judge gave him that, to state on the record his reasons for excluding the minority jurors, and all of the jurors there, and to come up with a race-neutral reason. And he just didn't do it. If he had done it, it would have been another story, but he didn't do it. Your Honor – So that's – what else is there? Your Honor, you're absolutely correct. The prosecutor was given an opportunity to explain the reasons for his strikes, and he declined that opportunity. All right. So then where does that leave us? Your Honor, this Court can affirm on either of two grounds. The district court addressed both grounds. Yee, cited by the prosecutor, does not involve a complete failure to offer any reasons. And the Supreme Court in Johnson reaffirms that, in fact, if the prosecutor offers the reasons, then the Court proceeds to Step 2. Yeah, but under the recent Yee case, didn't the Court make it rather specific that the first – the prima facie case and then the answer by the prosecutor are merely burdens of production, but the final decision has to be whether there was discrimination or not. And the defendant still carries that burden of proof. So under that format in Yee, what is it you're asking us to do? Your Honor, it is a burden of production, and that involves a burden to produce. And in this case, they attempted to produce reasons that were not, in fact, the prosecutor's reasons. Okay. So it didn't meet the burden of production. But there's still the basic burden that never leaves the defendant to show that there was discrimination. That's true. Under the Title VII cases, which the district court I think properly analogized to and which I think the Supreme Court has analogized to in its Batson cases, a failure to meet the burden of production at Step 2 means that there is a presumption that the Petitioner will win. It means there is some evidence. I didn't see anything about a presumption. In the Title VII cases, there is actual reference to a presumption that disappears when the burden is met. Yes, but not in this case. But, Your Honor – Not under Yee. That's not the case. Well, Yee involved a different situation. It involved a situation where the prosecutor at the time of trial gave reasons for seven out of the eight jurors who he struck, and just in a moment's lapse, just minutes earlier, couldn't quite remember what that eighth reason, what the reason for the eighth juror was. And the trial – the trial court had before it a prosecutor who had given valid reasons. No question that they were all valid. But that's the one juror. Except for one juror. And the trial court was – But one juror is enough, isn't it? It is. But in that case, the prosecutor was – the judge was also able to take into consideration the fact that the prosecutor had accepted the jury with the jurors that were later challenged. In this case, the prosecutor stopped immediately after he was caught. And the trial – the district court here made that finding, that the prosecutor here stopped using peremptory challenges because he was caught. Now it's a supplemental? That's what? Because he was caught. Because – He was challenged, not caught. Correct, Your Honor. He was – We don't know that, why he didn't exercise any more peremptories. You're making that out of the whole cloth. Your Honor, I'm just repeating what the trial court found. The trial court found it telling that the prosecutor – The district court. The trial court was the district court. Yes, Your Honor. You're right. It's there in the district court's magistrate's report. That it's telling that the prosecutor never once accepted the jury until after the Wheeler motion brought the pattern to the trial court's attention. But my point is it wasn't because he was caught or anything. He didn't make any additional challenges. That's true, Your Honor. That's true. And the trial court had an – the district court had an opportunity to evaluate the prosecutor and evaluate his credibility. And he had admitted – Well, didn't the trial judge in the State trial interject and give his indication that, yeah, everything's all right, so I don't think you need to put anything on the record. Wasn't there something like that there? The trial judge didn't say that the prosecutor didn't need to put anything on the record. What did he say? The prosecutor was – had been given the opportunity to say – to give an explanation. And he, as this Court noted, declined. The prosecutor said the defense has not made a prima facie state until they have. And the Court makes a ruling that a prima facie case has been established. Then this Wheeler motion should not go any further. At that point, the Court just said, yeah, I agree, and that's my ruling. And – And, of course, that was before Yee. It was. It was. But – Which seems to me that Yee made quite a clarification that these first two steps were burdens of production and that the defendant still had the ultimate burden to show that there was discrimination in the parameters. Well, Your Honor, it's certainly true that there's a burden of production, and the Supreme Court and this Court has often talked about both as burdens of production, a manner of organizing the presentation of evidence. But beyond that, the trial of the district court here found that the prima facie case, considering all the facts in the record, the prima facie case in this case was supported by a preponderance of the evidence. That would be enough, without any reasons, to sustain the Batson finding. The next question, though, is I believe that this Court can go to step three, because the prosecutor here offered – he offered proposed reasons. And he did two things. One is he submitted a declaration that he later disavowed, which he said, as Judge Pragerson pointed out, essentially what he said was, I don't know what my exact thoughts were. That's at Supplemental Excerpt 59. He told the Court he could only say what he thought he might have been thinking. So you have someone – you have a situation where the prosecutor tried to mislead the Court, which the Court said the submission of this declaration was misleading at best. And then you have the situation that those reasons were abjectly implausible in the words of the district court. I would like to focus just first on Shalonda Lewis. Shalonda Lewis is a young African-American woman who was, in essence, interchangeable with James Riggio, but for race and gender. They were both single. They both had no prior jury service. They were both youthful. She was 23, he 26. The only other known fact about them was that she was an advertising coordinator and he was an 8-year journalist. Although there was admittedly no memory of why he struck Lewis, the prosecutor submitted a sworn declaration that he distrusted media employees because they tried to see both sides. Yet he didn't strike James Riggio, the white male journalist with 8 years' experience in print media, but only Shalonda Lewis, the newspaper advertising salesperson. He criticized a supposed journalistic bias and yet kept the journalist and kicked the sales clerk. This problem was that he had no memory of why he struck James Riggio, the white male journalist with 8 years' experience in print media.  the about them was that he  That is evidence of discrimination. What is it you're asking us to do? Your Honor, ultimately, I'm asking you to affirm the judgment. Not to remand it for the district court to make a determination under the third step of Bassam? Your Honor, the district court has already made both made of the district court decided because the prosecution didn't present any evidence at step two that that was enough. And under Yee, that in Perkett, that isn't enough. Your Honor, Yee also involved a slightly different situation than this case, which Yee, as mentioned, Yee involved a situation where the prosecutor was able to give reasons. There was able to be a reconstruction of the reasons. Well, the prosecutor gave the reasons right at the time of the trial. Isn't that right? In Yee. Yeah. Yes. Right there and then. Yes, Your Honor. Just forgot one. Exactly. Remember one. Exactly. One's sure. That's all it takes. But the trial judge and in that case, and this Court was constrained by the AEDPA in Yee also. And in that case, the trial court made a finding that the ultimate discrimination, discriminatory intent, that was the trial court's finding, that the prosecutor did not engage in discriminatory intent, regardless of one or, but it was the question of his mental status at the time, or the prosecutor's mental status, and this Court was bound under the AEDPA to affirm unless it was, and I forget the exact, the exact wording, but it's an extremely stringent standard, as the Court's well aware. This case, the district court held a hearing, and the question was whether or not there could be a reconstruction of the reasons. And I would point out that this Court held in Alcantar, United States v. Alcantar, that if the passage of time prevents a meaningful reconstruction hearing, then the Court must remand for a new trial. And that was a decision of this Court. Yee made no pretense of trying to overturn Alcantar, a decision by Judge Hall, I believe, which quoted from a decision of U.S. District Court. If I just go back to Judge Carter in the district court, and the Court has asked to make a finding on the third prong. Your Honor, if the Court, if the Court believes that the record is not sufficiently complete, I would ask that certainly it shouldn't be. You know, you've got to be sensitive to certain vibes that are coming from this bench, and not, and not, and not, we're all sensitive here. Yeah, so, all right, you owe us 11 minutes and 12 minutes and 2 seconds. All right, sit. Okay, rebuttal? I will try to make it very brief. The Yee opinion, which has been discussed a lot, it really couldn't be more clear. I'll read directly from the opinion. It says, when the Batson test is properly applied, a prosecutor's failure to provide a reason for striking a potential juror is not an automatic violation of equal protection. The trial court must still proceed to step three before it can determine that purposeful discrimination has occurred. All right, okay. And also, just, just very brief. We know that, and then, now, when you go to step three, is it, is the trial court just going to stay within that framework, step one? You've got prima facie case. Step two, you've got nothing. You go to step three, you've already got a prima facie case. That means that the burden of proof has been sustained. Well, I, I think I understand the Court's question, but in Yee. I don't think you understand it. Well, I, I will do my best to answer it. In Yee, this Court held that an inference. The reason, the reason that these things happen is that, that, that the, the, the state court is sloppy about these things. You know, I served on that court for a while myself, and, and it's a huge court. There's 500 superior court judges in L.A. right now, and you know, one of the problems is, is that, that you have this master calendar. Case stays at a certain department, you know, and then the judges shift, so if there's problems, they, they don't come back to the, to the judge that presided over the case. They come back to the, the person who happens to be there at that time. You understand that, don't you? I, I, I do understand that. So, you've got to send out another bulletin. Look, when you get a chance, when you get a chance to give your reasons on, on these Batson issues, state them. That, that would certainly make things a lot easier. If you save the state, I mean, a guy like you, you're probably worth $3,000 an hour. Look at all, look at all the money we're wasting. I, I'll have to look for work in the private sector, I guess. But, but to answer your, your. It makes for full employment, magistrates, for district judges, for us. Briefly, briefly, if I could, I, I would like to read another portion of the E opinion where it's very short. It says, inferences are simply not enough, and the, the context is that inferences are not enough to sustain a finding of purposeful discrimination. It's got to be more. And in this case, when you factor in all the other evidence that, especially just the huge number of African-Americans that served on this jury, Petitioner has failed to demonstrate that the prosecutor purposefully discriminated in his exercise of peremptory challenges. Well, I mean, maybe if he hadn't discriminated, you'd had all, you'd had many more African-Americans on the jury. Who knows? Who knows? So what are you asking us to do? I am asking this Court to reverse the district court's opinion. And? And. Is that it? And affirm the State court's decision that there was no discrimination on, there was no Batson violation. Not, not remand, because the, the district court never reached that question. He just, the district court did it on the basis that the prosecutor never presented any evidence. And so that was the end of the, end of the ballgame. It's because it was before ye. Now, with ye having clarified it, I think it has to be remanded to the district court to reach that question. Reach the ultimate burden of proof as to whether it was carried or not. And it can conclude, it can include evidence as statistical. It can include other things that they, maybe that the reconstruction evidence that was there. But I think we almost have to return it, do we not? Well, Your Honor, my recollection of the district court's opinion is that alternatively, Your Honor is correct, that they found at step two, that since there were no reasons offered, that Respondent loses at step two. But alternatively, I think there was a finding at step three that even if step three was to be considered, the court still found a, a, still found purposeful discrimination on the part of the prosecutor. Really? But. Let me ask you a practical, I don't have it in front of me, it's, my recollection is similar. And just from your office's perspective, you might win some ground incrementally. But the impression left, at least by the magistrate judge's opinion, is that I don't think it's going to make any difference in his mind. We've got Judge Carter in between and we can't speak quite as directly as to what he might think. Does your office request a remand? If, if we decide that, that ye requires you go to the third stage and looking at the district court's decision, it's not clear enough whether or not they did, is that a result you request? Or do you think it's pretty clear what the district court was trying to do? Well, the district court adopted the magistrate's report and recommendation. But as your honor indicated, it was not Judge Carter's opinion. He adopted fully the opinion of the magistrate. It's Judge Carter's opinion. That he. It's his opinion. I'm sorry, I misspoke, yes. Yeah. It is his opinion, but it is the same as the report and recommendation filed by the magistrate judge. So the inferences you might, we might not be quite so certain about the inferences to be drawn by Judge Carter as we might be about the inferences to be drawn by or that would be drawn if returned by the magistrate judge. So that is correct. What is the position of your office? Do you request a remand to reach the third stage under ye if, if, if we would be inclined to do that? Or is that something you think would wind up being a waste of time because you know what's going to happen when it goes back to the district court? I, I would request that. I guess our request would be two-pronged. First of all would be for this court to reverse the district court. But if not, we would be amenable to a remand to, to Judge Carter. Thank you very much. You know, let me, let me, let me just say this. We have in our system, say in L.A. alone, I don't know the exact figures, a dozen or more magistrate judges, right? I think it's about 26. 26. And you know what their basic job is? To go over these state habeas petitions. And why do they have to come up with all these pages? Huh? You know, we have to build bigger courthouses for them and everything else because the state court sloughs off its work. That's the reason for it. You know, there's the, you know, but that's part of full employment, as I said before, because when I first got on the district court, we went through these ourselves. There got to be so many of them that some of the judges thought we needed to have magistrate systems. So Judge Hill and Judge Ferguson, they were the pioneers in developing that system. But you could see the hours that went in. On our side, right? I do. And out of, let's say, a thousand habeas petitions are filed in the district court in a year, let's say, you know, you're granted. I do not. Maybe one, maybe two. See, that's all. And, but they have to go through all this tremendous work over here. And anyway, it's, we try to, I know Judge Hugg was our chief judge, we try to work these things out with the state system. But, you know, they're overwhelmed, too. And, you know, they use the system of sending out postcards and everything else. So we end up doing all the work. And then if there's, you know, one or two in a thousand that gets granted, then the state goes crazy. So they're interfering with us, you know. But anyway, to send that out is bullet number three. I will do that. Thank you, Your Honor. All right. This matter is submitted. Now we'll go to.
judges: Hug, Pregerson, Clifton